UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THOMAS BRETT KIERCE,
    Petitioner,
v.                                          Case No. 8:23-cv-1174-KKM-LSG

SECRETARY, DEPARTMENT
OF CORRECTIONS,
    Respondent.
_____

## ORDER

Thomas Brett Kierce, a Florida prisoner, timely[1] filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court convictions for armed false imprisonment, robbery with a deadly weapon, and armed burglary. (Docs. 1, 1-1.) Having considered the petition, (*id.*), the response in opposition, (Doc. 7), and the reply, (Doc. 8), the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

**I.    BACKGROUND**

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). The appellate court affirmed Kierce's convictions on March 9, 2018. (Doc. 7-2, Ex. 14.) His judgment became final 90 days later, on June 7, 2018, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 46 days of untolled time, on July 24, 2018, Kierce filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 7-2, Ex. 19.) That motion remained pending—and the limitation period was paused—until August 18, 2022, when the appellate mandate issued. (*Id.*, Ex. 34.) At that point, Kierce had 319 days—or until July 3, 2023—to seek federal habeas relief. He met the deadline, filing his petition on May 26, 2023. (Doc. 1.) Therefore, the petition is timely.

1

### A. Factual Background, Plea Hearing, and Sentencing

This case arises from the robbery of a Circle K convenience store in Winter Haven, Florida. Shortly after 2:00 a.m. on October 22, 2014, a man entered the store wearing "black clothing and a black mask." (Doc. 7-2, Ex. 2, at 2.) He held a cup in his right hand and an aluminum baseball bat in his left. (*Id.*) At the time, the cashier was "washing her hands" in "the rear of the store," which served as an "office" and storage area. (*Id.*) She looked down a hallway and saw the man "approaching her." (*Id.*) He threw "an unknown type of liquid" in her face, told her to "get on the floor," and tied her hands "with an extension cord." (*Id.*) After subduing the cashier, the man returned to the "front counter," where he stole cigarettes and approximately $50 in cash. (*Id.*) He then left the store. (*Id.*)

The suspect was not identified until October 2015—a year after the robbery. (*Id.* at 3.) Police had obtained a DNA profile from the extension cord used to tie the cashier's hands. (*Id.*) The Florida Department of Law Enforcement ran the profile through CODIS, a national DNA database. (*Id.*) The major contributor to the profile was the cashier; the minor contributor was Kierce. (*Id.*) The likelihood that somebody else was the minor contributor was "one in 1.5 billion." (*Id.*, Ex. 27, at 13–14.) The extension cord "was already in the rear" of the store when the robbery took place. (*Id.*, Ex. 2, at 3.) Kierce was not—and had "never been"—a Circle K employee, but he did visit the store as a customer. (*Id.*; *see also id.*, Ex. 27, at 33.)

2

The state charged Kierce with armed false imprisonment, robbery with a deadly weapon, and armed burglary. (*Id.*, Ex. 4.) Armed false imprisonment is a second-degree felony with a statutory maximum of 15 years' imprisonment. *Pickett v. State*, 109 So. 3d 841, 843 (Fla. 3d DCA 2013); Fla. Stat. § 775.082(3)(d). Robbery with a deadly weapon and armed burglary are "first-degree felonies punishable by a term of incarceration not exceeding life." *Gordon v. State*, 793 So. 2d 1126, 1126 (Fla. 5th DCA 2001).

Kierce ultimately entered an open plea of guilty to all charges. (Doc. 7-2, Ex. 6, at 16.) At the plea hearing, defense counsel explained that he had "talked to the state . . . on numerous occasions and there [was] no [plea] offer."[2] (*Id.* at 6.) The prosecutor confirmed that there "ha[d] not been an offer." (*Id.* at 10.) Kierce expressed dissatisfaction with counsel, claiming that counsel had not visited him in jail or "talked to [him] about [his] situation." (*Id.* at 8.) Counsel responded that he had "go[ne] over the case with" Kierce at the jail, that he had reviewed "the discovery," and that "[t]oday [was] the first [he] heard of" any dissatisfaction with his representation. (*Id.* at 9–10.)

The court found that counsel had not been "ineffective." (*Id.* at 10.) It explained that Kierce could either "fire [counsel] and . . . go alone" or "hire [his] own attorney." (*Id.* at 11.) Kierce opted to keep his lawyer and pleaded guilty. (*Id.*) The court asked whether he needed "more time to talk to [counsel]"; he said he wanted to "go forward." (*Id.*) A plea colloquy

---

[2] Kierce's family hired counsel to represent him. (Doc. 7-2, Ex. 27, at 28.)

followed. The court explained, among other things, the statutory maximum sentence for each offense. (*Id.* at 11–12.) After finding that Kierce was "competent, coherent, and alert," the court accepted the plea. (*Id.* at 16.)

At sentencing, Kierce said he was "sorry" for "what [he] put" the victim through. (*Id.*, Ex. 7, at 15.) He explained that he committed the robbery to "get money for drugs." (*Id.* at 13–14.) And he asked for a lenient sentence so he could "be there for [his] daughters." (*Id.* at 15.) Counsel acknowledged that Kierce's behavior was "unacceptable." (*Id.* at 30.) But he stressed that Kierce "did not take this matter to trial, did not make [the victim] go through . . . testifying," and had a relatively minor criminal history. (*Id.*) Based on these facts, counsel asked for a sentence of seven-and-a-half years' imprisonment. (*Id.* at 29.) The prosecutor recommended a life sentence, describing Kierce as "a danger to the community." (*Id.* at 34.) The court imposed a total sentence of 65 years' imprisonment, consisting of consecutive terms of 25 years for robbery with a deadly weapon, 25 years for armed burglary, and 15 years for armed false imprisonment. (*Id.* at 39.) Kierce was 30 years old at the time of sentencing. (*Id.*, Ex. 2, at 1.)

### B. State Postconviction Proceedings

Following an unsuccessful direct appeal, Kierce moved for postconviction relief under Rule 3.850. (*Id.*, Exs. 14, 19, 21–23.) He argued that counsel was ineffective for (1) failing to "identify and present" alibi witnesses, (2) "misleading the court" at the plea hearing, and (3) "coercing" him into pleading guilty. (*Id.*, Ex. 23.) The postconviction court summarily

4

rejected the second and third claims. (*Id.*, Exs. 24, 26.) It held an evidentiary hearing on the alibi-based claim. (*Id.*, Ex. 26.)

Two alleged alibi witnesses testified at the hearing.[3] Breanna Wood, Kierce's fiancée, claimed that on the night of the robbery, she "fell asleep" around 10:00 or 10:30 p.m. (*Id.*, Ex. 27, at 34–35.) Kierce was allegedly "in bed" with her at the time. (*Id.* at 34.) Her sleep was "undisturbed," and she awoke at "eight in the morning when [Kierce] pulled into the driveway driving [her] minivan." (*Id.* at 36.) As noted above, the robbery took place at approximately 2:00 a.m. (*Id.*, Ex. 2, at 2.) The other alleged alibi witness was Kierce's mother. (*Id.*, Ex. 27, at 38.) At the hearing, however, she did not claim to have an alibi for her son. (*Id.* at 38–40.) She said only that she never told trial counsel she "had information about where [Kierce] was that night." (*Id.* at 39.)

Counsel testified at the hearing as well. He said that "no one ever told him" they could provide an alibi for Kierce. (*Id.* at 21.) In counsel's view, Kierce "had everything going against him." (*Id.* at 10.) Specifically, Kierce had left his DNA on the "cord . . . used to tie up the victim," and he could not explain how that happened. (*Id.* at 10, 17.) According to counsel, Kierce was "put in a box" because the state "would not make him a [plea] offer" and the judge was "known for . . . sentencing to the max" after trial. (*Id.* at

---

[3] A third witness—Kierce's stepfather—was mentioned in the Rule 3.850 motion, but he did not testify at the evidentiary hearing. (Doc. 7-2, Ex. 23, at 4; Doc. 7-2, Ex. 27.)

5

12–13, 20.) So Kierce could either "go to trial"—which he did not want to do—or "plead straight up" and "beg[] for mercy." (*Id.* at 20–21, 23.) Kierce opted for the latter course. (*Id.* at 22.) During a discussion about the upcoming plea hearing, Kierce "admitted" to counsel that he had committed the robbery.[4] (*Id.* at 22–23.)

    The postconviction court ultimately rejected Kierce's alibi-based claim, finding no "reasonable probability that [Kierce] would have insisted on proceeding to trial" but for counsel's alleged deficiency. (*Id.*, Ex. 28, at 3.) The court explained that an "alibi defense" was unlikely to "succeed at trial as no alibi . . . [was] established." (*Id.*) Specifically, Wood could not "provide an alibi" for Kierce because she "slept through the night undisturbed," and when she awoke at 8:00 a.m., Kierce "was pulling into the parking area of the residence in [her] vehicle." (*Id.* at 2.) This meant that Kierce "had obviously left the shared bed at some point [in] the evening or early morning hours and [] Wood was unaware of his leaving." (*Id.*) Thus, Wood could not testify to Kierce's whereabouts at "2:00 a.m.[,] when the robbery occurred." (*Id.*) Likewise, Kierce's mother and stepfather "did not testify concerning the whereabouts of [their] son the evening of" the robbery. (*Id.*)

    The appellate court affirmed the denial of postconviction relief in an unexplained decision. (*Id.*, Ex. 33.) Kierce then filed a federal habeas petition,

---

[4] Kierce did not testify at the evidentiary hearing.

6

raising the three ineffective-assistance claims asserted in his Rule 3.850 motion. (Docs. 1, 1-1.)

## II. STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as

of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade,* 538 U.S. 63, 75 (2003) (stating that "[t]he

8

state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but

9

the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

### III. <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Kierce alleges ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id*. at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant

by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id*. at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of

11

ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV. ANALYSIS[5]

### A. Ground One—Failure to Present Alibi Defense

Kierce faults trial counsel for "failing to adequately investigate and prepare a defense." (Doc. 1-1 at 2.) According to Kierce, had counsel conducted a proper investigation, he "would have learned" about three purported alibi witnesses—Kierce's fiancée Breanna Wood, his mother, and his stepfather. (*Id.* at 4.) As explained above, the postconviction court rejected this claim after an evidentiary hearing. It found no "reasonable probability that [Kierce] would have insisted on proceeding to trial" but for counsel's alleged failure to investigate. (Doc. 7-2, Ex. 28, at 3.) In the court's view, an "alibi defense" was unlikely to "succeed at trial" because "no alibi . . . [was] established." (*Id.*) Thus, Kierce could not show prejudice from counsel's alleged deficiency. (*Id.*)

This ruling was reasonable. To show prejudice in the context of a guilty plea, a petitioner must establish "a reasonable probability that, but for

---

[5] Respondent argues that Grounds One and Two are partially unexhausted. (Doc. 7 at 6.) I need not decide that issue because, even assuming Kierce fully exhausted his state-court remedies, both claims fail on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

12

counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "Courts should not upset a plea solely because of post hoc assertions from [the petitioner] about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017). Instead, the petitioner must "convince the court that a decision to reject [a] plea [] would have been rational under the circumstances." *Diveroli v. United States*, 803 F.3d 1258, 1265 (11th Cir. 2015). Where, as here, "the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the [petitioner] by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59. "This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.* Moreover, because AEDPA applies to this claim, Kierce must show that the postconviction court's finding of no prejudice "was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Kierce cannot make this showing. As the postconviction court correctly explained, Kierce failed to "establish[]" an alibi for the time of the robbery. (Doc. 7-2, Ex. 28, at 3.) Kierce's stepfather did not testify at the hearing, and Kierce's mother could not speak to "the whereabouts of her son" during the robbery. (*Id.* at 2.) Wood could not provide an alibi either.

13

On the night of the robbery, she "fell asleep" around 10:00 or 10:30 p.m. (*Id.*, Ex. 27, at 34–35.) At the time, Kierce was "in bed" with her. (*Id.* at 34.) She slept "undisturbed," waking up at "eight in the morning when [Kierce] pulled into the driveway driving [her] minivan." (*Id.* at 36.) Thus, as the court noted, Kierce "had obviously left the shared bed at some point [in] the evening or early morning hours and [] Wood was unaware of his leaving." (*Id.*, Ex. 28, at 2.) As a result, Wood could not account for Kierce's whereabouts at "2:00 a.m.[,] when the robbery occurred." (*Id.*)

On this record, a reasonable jurist could agree that an "alibi defense" was unlikely to "succeed at trial" because "no alibi . . . [was] established." (*Id.* at 3.) And with no alibi, there is no "likelihood" that counsel would have "recommend[ed]" going to trial had he investigated the matter. *Hill*, 474 U.S. at 59. Therefore, the postconviction court reasonably concluded that counsel's alleged deficiency did not prejudice Kierce.[6] *See Martinez v. Sec'y, Fla. Dep't of Corr.*, 684 F. App'x 915, 925 (11th Cir. 2017) (finding it "unlikely that the choice to proceed to trial would have been rational" because petitioner's "potential alibi defense [did] not appear particularly strong"); *Gaedtke v. Sec'y, Dep't of Corr.*, 369 F. App'x 12, 18–19 (11th Cir. 2010) ("Because the evidence [petitioner] claims his counsel should have

---

[6] Kierce does not identify any other plausible defense to the charges in this case. Nor does he explain how his DNA ended up on the extension cord, which "was already in the rear" of the store—the office and storage area—when the robbery took place. (Doc. 7-2, Ex. 2, at 3.)

14

discovered through investigation would not likely have changed the outcome of the trial, we fail to see how it would have led counsel to change his plea recommendation.").

### B. Ground Two—Counsel's Conduct at the Plea Hearing

Kierce argues that trial counsel "affirmatively misle[d]" the court at the plea hearing. (Doc. 1-1 at 6.) First, counsel "claimed that he had visited the jail and discussed defenses with" Kierce when he "had not done so." (*Id*.) Second, counsel was allegedly "untruthful" when he said that "he had not heard from [Kierce's] family." (*Id.* at 6–7.) Third, counsel allegedly should have "inform[ed] the court that [Kierce] was eligible for the service of the public defender and was free to discharge counsel." (*Id.* at 7.) Kierce's theory of prejudice runs as follows. He says that, but for counsel's alleged misconduct at the hearing, "there is a reasonable probability that [he] would have retained new counsel or been entitled to court-appointed counsel." (Doc. 8 at 6.) His new attorney would then have "conduct[ed] the investigation into available defenses that counsel refused to perform" and presented those "defenses" at trial. (*Id*.)

The postconviction court reasonably rejected this claim on the ground that Kierce's allegations of "prejudice [were] vague and speculative." (Doc. 7-2, Ex. 26, at 2.) As with Ground One, the prejudice inquiry here turns on "the likelihood that discovery of [additional] evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59. That assessment "depend[s] in large part on a prediction whether the

15

evidence likely would have changed the outcome of a trial." *Id.*; *see also Singleton v. Sec'y Dep't of Corr.*, No. 8:07-cv-1419-VMC-MAP, 2009 WL 975783, at *4 (M.D. Fla. Apr. 9, 2009) ("The best way to evaluate whether there is a reasonable probability a petitioner would have insisted on going to trial is to determine whether petitioner had available a defense that would likely have borne fruit at trial.").

As explained above, Kierce does not point to any evidence that "likely would have changed the outcome of a trial." *Hill*, 474 U.S. at 59. Thus, even if Kierce had hired a new attorney to "investigat[e] . . . available defenses," (Doc. 8 at 6), there is no basis to conclude that the investigation "would have led counsel to" recommend going to trial, *Hill*, 474 U.S. at 59. As the postconviction court put it, Kierce failed "to prove anything other than the mere possibility of prejudice." (Doc. 7-2, Ex. 26, at 3.) That is not enough to sustain an ineffective-assistance claim. *See Strickland*, 466 U.S. at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.").

### C. Ground Three—"Coercing" Kierce into Pleading Guilty

Kierce contends that trial counsel "coerc[ed]" him into pleading guilty by advising him that "if he proceeded to trial and lost[,] he would receive a harsher, maximum sentence of life in prison than if he changed his plea to an open plea." (Doc. 1-1 at 13.) Kierce also faults counsel for failing to inform him before he pled guilty that he was not subject to sentencing as a habitual

16

felony offender ("HFO"). (*Id.* at 13–14.) The postconviction court rejected both claims, explaining that (1) even without the HFO enhancement, Kierce faced a statutory maximum of life in prison, and (2) counsel "had a duty to advise his client of the maximum possible sentence." (Doc. 7-2, Ex. 24, at 2.) This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

First, a reasonable jurist could find that counsel did not coerce Kierce into pleading guilty. According to Kierce, counsel advised him to enter an open plea because if he lost at trial, "he would receive a harsher, maximum sentence of life." (Doc. 1-1 at 14.) That is not coercion. Kierce does not "allege actual or threatened physical harm, promises to cease improper harassment, [] bribes," or any other conduct "that overcame his free will." *Jones v. Estelle*, 584 F.2d 687, 689–90 (5th Cir. 1978). Counsel may have "told [Kierce] that he would be sentenced to life in prison if he went to trial," but "an attorney does not 'threaten' [or coerce] her client merely by advising him of the practical and legal consequences of a given decision." *Tillery v. United States*, No. 3:10-cr-188-TJC-JRK, 2016 WL 145994, at *4 (M.D. Fla. Jan. 13, 2016). Likewise, "a plea is not involuntary solely because a defendant pleads guilty out of a desire to limit the possible penalty." *Estelle*, 584 F.2d at 690. Furthermore, Kierce stated at the plea hearing that nobody had "forced [him] or threatened [him] to get him to enter this plea." (Doc. 7-2, Ex. 6, at 13.) Such "[s]olemn declarations in open court carry a strong presumption of verity."

17

*Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Kierce has not overcome that presumption.

Second, a reasonable jurist could conclude that Kierce suffered no prejudice from counsel's failure to inform him that he was not an HFO. Two months before the plea hearing, the state filed a notice of intent to seek HFO sentencing. (Doc. 7-2, Ex. 5.) At sentencing, the state withdrew the notice, explaining that Kierce did not qualify as an HFO. (*Id.*, Ex. 7, at 4.) The court did not impose an HFO sentence. (*Id.* at 39.) It sentenced Kierce to 65 years in prison—consecutive terms of 25 years for robbery with a deadly weapon, 25 years for armed burglary, and 15 years for armed false imprisonment. (*Id.*)

Even if Kierce had known from the start that he did not qualify as an HFO, there is no "reasonable probability" that he "would have insisted on going to trial." *Hill*, 474 U.S. at 59. The "HFO provision allows courts to sentence a defendant who qualifies as an HFO to an extended term of imprisonment." *Foulks v. State*, 306 So. 3d 1178, 1185–86 (Fla. 3d DCA 2020). Thus, the HFO statute "increase[s] the maximum sentence that can be imposed" for certain offenses, *id.*, but "it does not require a mandatory minimum sentence," *Peek v. State*, 143 So. 3d 1101, 1102 (Fla. 5th DCA 2014).

Here, the HFO designation would have increased the statutory maximum for armed false imprisonment from 15 years to 30 years. *Peek*, 143 So. 3d at 1101. But, as the postconviction court explained, the HFO designation had no effect on the statutory maximum for armed burglary or robbery with a deadly weapon. (Doc. 7-2, Ex. 24, at 2.) Even without the

18

enhancement, those offenses were "punishable by a term of incarceration not exceeding life." *Gordon*, 793 So. 2d at 1126. Thus, regardless of the HFO designation, Kierce faced the same maximum sentence—life in prison.

In these circumstances, a reasonable jurist could conclude that the possibility of HFO sentencing had no "effect on [Kierce's] decision to plead guilty."[7] *Winthrop-Redin v. United States*, 767 F.3d 1210, 1219–20 (11th Cir. 2014); *see also Owens v. Sec'y Dep't of Corr.*, No. 8:24-cv-717-WFJ-NHA, 2025 WL 1078949, at *7 (M.D. Fla. Apr. 10, 2025) ("Because the statutory maximum amounted to life in prison regardless of the HFO error, there is no basis to conclude that the overstatement of [petitioner's] maximum exposure was a decisive factor in his decision to plead guilty."); *Bluntson v. Crews*, No. 3:13-cv-20-MCR-CJK, 2015 WL 874789, at *12 (N.D. Fla. Feb. 27, 2015) (no reasonable probability that petitioner would have "insisted on going to trial" had he known his "true" sentencing exposure was "230 or 150 years rather than the 115 years he was told"). Therefore, the postconviction court reasonably rejected this claim.

## V. CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has

---

[7] The same conclusion would follow under de novo review.

made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Kierce must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Kierce has not made the requisite showing. Finally, because Kierce is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Kierce's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Kierce and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on September 5, 2025.

Kathryn Kimball Mizelle
United States District Judge